Julio **CONEO–GUERRERO**, Petitioner,

v.

**UNITED STATES of America,** Respondent.

Jesus A. **Villa–Contreras,** Petitioner,

v.

**United States of America, Respondent.**

Juan Jose **Arango–Herrera,** Petitioner,

v.

**United States of America, Respondent.**

Nos. CIV. 00–1491(JAF), CIV. 00–1492(JAF), CIV. 00–1565(JAF).
No. CR. 95–218.

United States District Court, D. Puerto Rico.

March 30, 2001.

Zygmunt G. Slominski, Ledgewood, NJ, Julio Coneo–Guerrero, pro se, Elkton, OH, for Julio Coneo–Guerrero, plaintiffs.

Miguel A. Fernandez–Torres, U.S. Attorney's Office District of P.R., Civil Division, Hato Rey, PR, for U.S., defendants.

### OPINION AND ORDER

FUSTE, District Judge.

Petitioners, Julio Coneo–Guerrero, Juan José Arango–Herrera, and Jesús Villa–Contreras, file three separate petitions seeking habeas relief from their federal court convictions on narcotics-related charges. Since Petitioners were convicted at a joint trial based on the same underlying facts, we consolidate these petitions for disposition.

### I.

#### Factual and Procedural Synopsis

We draw the following factual summary from the First Circuit opinion affirming our April 11, 1996 judgments. *See United States v. Coneo–Guerrero,* 148 F.3d 44 (1st Cir.1998).

During the nighttime hours of June 27–28, 1995, United States Customs officers conducting aerial surveillance detected a boat with its lights extinguished traveling toward Puerto Rico. At the time the ship was detected, the U.S. Customs plane was flying about fifteen miles south of Puerto Rico. The U.S. Customs pilots, along with agents from other agencies, tracked the boat until it arrived at Cayo Cabuzazos, an area approximately three miles from the Puerto Rican coast. Using night vision goggles, the agents observed the crew of the boat throwing items overboard into the sea. To gain better visibility of the suspicious activity, federal agents called in a helicopter which directed a bright "night sun" searchlight at the vessel. The boat immediately fled south. After a long chase, federal agents and a local marine police unit apprehended the boat approximately thirteen or fourteen miles away from the coast of Puerto Rico.

Agents boarded the boat and arrested Petitioners, along with the captain of the vessel, Edgardo Domínguez–Moreno, who died after trial, but prior to sentencing. On the boat, agents discovered that the dashboard lights had been covered with dark tape to reduce their glow at night. Agents also discovered a handwritten note plotting the boat's route from Colombia, South America, to Puerto Rico. Agents found a second note, written in Spanish, describing an allocation: "399 for the office"; "85 for Nando"; "85 for Lindo"; and "5 for the crew." Law enforcement agents also recovered a pair of burlap sacks on the boat.

In Cayo Cabuzazos, where agents had observed Petitioners dumping objects from their boat, agents found numerous burlap sacks floating in the water, as well as 543 kilograms of cocaine packaged in hundreds of bundles. The sacks discovered aboard Petitioners' boat matched those floating in Cayo Cabuzazos. The sacks found in both locations contained traces of cocaine.

A week after Petitioners were arrested, a grand jury indicted them for violating 18 U.S.C. § 2 (1994),[1] 21 U.S.C. § 841(a)(1) (1994),[2] and 21 U.S.C. § 952(a) (1994).[3] After a four-day trial, a jury returned guilty verdicts against Petitioners, and this court sentenced each Petitioner to concurrent sentences of 235 months of imprisonment.

On July 14, 1998, the First Circuit affirmed our judgment. The United States Supreme Court denied Petitioners' application for writ of certiorari on April 26, 1999.

Petitioners Villa–Contreras and Coneo–Guerrero filed their section 2255 petitions on April 24, 2000, and Petitioner Arango–Herrera filed his section 2255 petition on April 26, 2000.

## II.

### Section 2255

Under section 2255, a petitioner is entitled to an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Therefore, a motion for section 2255 relief may only be denied without a hearing if "the petitioner's allegations, accepted as true, would not entitle [him] to relief," *Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir.1990) (per curiam), or if the allegations are not believable as true because "they are contradicted by the record, in-

herently incredible, or conclusions rather than statements of fact." *United States v. Michaud*, 925 F.2d 37, 39 (1st Cir.1991) (quoting *Dziurgot*, 897 F.2d at 1225).

## III.

### Analysis

### A. Petitioner Coneo–Guerrero

Petitioner Coneo–Guerrero alleges that he is entitled to habeas relief on the following grounds: (1) this court did not have jurisdiction to impose his judgment and sentence; (2) his conviction was obtained using evidence acquired during an unlawful search and seizure; (3) his Fifth Amendment rights were violated; (4) the government failed to disclose favorable evidence; and (5) Petitioner Coneo–Guerrero received ineffective assistance of counsel. We address each argument in turn.

### 1. Jurisdiction

Petitioner Coneo–Guerrero contends that he is entitled to habeas relief because this court did not have jurisdiction to impose the judgment and sentence against him. Petitioner Coneo–Guerrero avers that his arrest violated international law because he was arrested by Puerto Rico police outside the customs waters of the United States. Petitioner Coneo–Guerrero claims that because the vessel used in the cocaine smuggling was of Colombian origin and registry, and since Pe-

---

1. The statute reads: "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

2. The statute provides: "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally-(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).

3. The statute reads: "[i]t shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter." 21 U.S.C. § 952(a).

titioners were all Colombian nationals, the seizure of the vessel and arrest of Petitioners in international waters was unlawful. Petitioner Coneo–Guerrero further alleges that his arrest violated the Maritime Drug Law Enforcement Act, 46 U.S.C.App. § 1903 (1970 & Supp. I.2000).[4]

■ In this case, even though Petitioners were arrested in international waters, it is apparent that they intended to distribute the cocaine within the United States, since the drugs were dumped overboard only three miles from the shores of Puerto Rico. After a long chase, agents apprehended Petitioners in international waters only after Petitioners fled U.S. waters upon being approached by law enforcement agents. We find that this court has jurisdiction over Petitioners' offenses, because a country has jurisdiction over criminal conduct which took place within its borders. *See* 4 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE §§ 16.4(b), 16.4(c) (2d ed.1999).

■ Moreover, Congress may enact penal statutes having effect outside the territorial boundaries of the United States. *See United States v. Baker*, 609 F.2d 134, 136 (5th Cir.1980). Accordingly, a " 'sovereign may exercise jurisdiction over acts done outside its geographical jurisdiction which are intended to produce detrimental effects within it.' " *United States v. Hayes*, 653 F.2d 8, 11 (1st Cir.1981) (citing *United States v. Arra*, 630 F.2d 836, 840 (1st Cir.1980)) (upholding narcotics-related convictions of defendants arrested on the high seas).

■ The statutes Petitioner Coneo–Guerrero was convicted of violating, 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 952(a), do not mention whether Congress intended to include offenses committed on the high seas. A statute that is silent on the issue of extraterritorial application may be given extraterritorial effect if Congress intended the statute to apply outside the United States. *Baker*, 609 F.2d at 136.

With regard to 21 U.S.C. § 841(a)(1), the First Circuit has held that "so long as it is clear that the intended distribution would occur within the territorial United States ... jurisdiction may be maintained (under 841(a)(1)) where defendants are apprehended outside the territorial waters." *Hayes*, 653 F.2d at 15–16 (internal citation omitted).

Statutes intended to curb trafficking in controlled substances would be greatly limited in efficacy if the government was unable to prosecute individuals arrested outside U.S. territorial boundaries. *See United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922) (describing types of criminal statutes that should be given extraterritorial effect); *Baker*, 609 F.2d at 137 ("The power to control efforts to introduce illicit drugs into the United States from the high seas and foreign nations is a necessary incident to Congress' efforts to eradicate all illegal drug trafficking.").

As we will discuss *infra*, Petitioner Coneo–Guerrero's Fourth Amendment, Fifth Amendment, and *Brady* theories for relief, which are intertwined with his claim that

---

4. The statute provides:

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a citizen of the United States or a resident alien of the United States on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C.App. § 1903(a).

this court lacked jurisdiction, must also fail.

### 2. *Search and Seizure*

Petitioner Coneo–Guerrero claims that his conviction was obtained by use of evidence gained pursuant to an illegal search and seizure. Petitioner Coneo–Guerrero argues that since the arrest of Petitioners and seizure of the ship took place in international waters, the evidence gained from the boarding of the boat must be suppressed as fruits of the poisonous tree. Petitioner Coneo–Guerrero contends that the following evidence should have been suppressed at trial due to alleged infringements on his Fourth Amendment rights: a plastic bag, debris, fiber and twine from the boat, photographs of the seized vessel and its equipment, letters, notes, invoices, inventories, money, and nautical charts.

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court limited the availability of collateral review of state court judgments regarding Fourth Amendment violations. *See Tart v. Commonwealth of Mass.*, 949 F.2d 490, 497 n. 6 (1st Cir.1991) (citations omitted). Specifically, the Court held that when a State provides an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a federal court grant a state prisoner habeas corpus relief on the ground that the prosecution introduced at trial unlawfully searched or seized evidence. *See Johnson v. Moran*, 812 F.2d 23, 24 (1st Cir.1987).

In reaching its holding, the Supreme Court emphasized the nature and purpose of the exclusionary rule rather than the general function of federal habeas review. *See* 6 LaFave Et Al., *supra*, § 28.3(c). The Court noted that the exclusionary rule is a judicially created remedy, and not a personal right of a criminal defendant. *Stone,* 428 U.S. at 486, 96 S.Ct. 3037; *see United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The rule's primary function, the Court emphasized, is to "deter police misconduct by eliminating the incentive for police officers to disregard constitutional requirements on the chance they may turn up evidence which would incriminate the defendant." *United States v. Aiudi,* 835 F.2d 943, 945 (1st Cir.1987) (discussing *Stone* and its progeny). Thus, since the exclusionary rule is not designed to redress the injury the search victim may have suffered to his privacy, *Calandra,* 414 U.S. at 347, 94 S.Ct. 613 (citation omitted), its application is limited to " 'those areas where its remedial objectives are thought most efficaciously served.' " *United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (citation omitted). The Court concluded that the costs of enforcing the exclusionary rule in collateral review of state court convictions outweigh the potential benefits of deterring future police misconduct.[5]

Although the First Circuit has not extended *Stone* to section 2255 cases, *Arroyo v. United States,* 195 F.3d 54 (1st Cir.1999), the Supreme Court's reasoning applies equally to federal prisoners. The application of the exclusionary rule on habeas corpus review of federal court proceedings would have very little deterrent effect, if any, on deliberate police misconduct given the temporal and, oftentimes,

---

**5.** The social costs of the exclusionary rule include impeding the truth-seeking function of the judge and jury; facilitating the release of some guilty defendants or improving the terms of their plea bargains; penalizing law enforcement officers who acted in good faith; and, as a result of these other costs, inciting general disrespect for the law and the administration of justice. *Leon,* 468 U.S. at 907–08, 104 S.Ct. 3405 (citations omitted).

geographical distance between the alleged Fourth Amendment violation and the federal habeas corpus review.[6] The social costs, however, would remain as high. Thus, we find that a federal prisoner may not collaterally attack the introduction at trial of unlawfully searched or seized evidence if he had a full and fair opportunity to litigate the alleged Fourth Amendment violation at trial or on direct appeal.

Precedent from the Tenth and the Ninth Circuits supports our finding. *See, e.g., United States v. Cook,* 997 F.2d 1312, 1317 (10th Cir.1993) (discussing three Supreme Court cases which support the extension of *Stone* to federal prisoners); *United States v. Hearst,* 638 F.2d 1190, 1196 (9th Cir. 1980). Similarly, other circuits may soon extend *Stone* to section 2255 cases. *See United States v. Schulte,* No. 99–7667, 2000 WL 1390205, at *1 (4th Cir. Sept.26, 2000); *United States v. Harrison,* No. 99–3134, 2000 WL 818815, at *1 (D.C.Cir. May 19, 2000).

Here, Petitioner Coneo–Guerrero has not made an affirmative showing, as he must, *see Tart,* 949 F.2d at 497 n. 6, that he was not afforded a full and fair opportunity to present his Fourth Amendment claim in federal court. Consequently, we find that Petitioner Coneo–Guerrero may not argue his Fourth Amendment claim in his section 2255 application.

■ Additionally, Petitioner Coneo–Guerrero's Fourth Amendment claim is based on this court's alleged lack of jurisdiction over the underlying case because the ship was seized on international waters. As we have already explicated, *supra* at (III)(A)(1), this court properly exercised jurisdiction over the underlying offenses. Since the arrest of Petitioners and the seizure of the vessel were not unlawful, Petitioner Coneo–Guerrero's Fourth Amendment claim necessarily fails.

### 3. *Fifth Amendment*

Petitioner Coneo–Guerrero claims that his conviction was obtained in violation of his Fifth Amendment privilege against self-incrimination. Petitioner Coneo–Guerrero alleges that since his arrest and the seizure of the boat on the high seas were unlawful, any statements obtained from him should have been suppressed. Petitioner Coneo–Guerrero objects to admission at trial of statements made by him regarding his origin, nationality, and occupation.

We easily dispose of this argument since we have already found that Petitioner Coneo–Guerrero's arrest and the seizure of the boat were not unlawful. Consequently, we find that there was no infringement on Petitioner Coneo–Guerrero's Fifth Amendment rights.

### 4. *The Government's Alleged Failure to Disclose Favorable Evidence*

Petitioner Coneo–Guerrero argues that he was convicted because the government failed to disclose evidence which allegedly supported the conclusion that Petitioners were unlawfully arrested and the vessel was unlawfully seized. Petitioner Coneo–Guerrero maintains that the government was aware that federal and local agents did not have the authority to arrest Petitioners and seize the boat on the high seas. Citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and the Jencks Act, 18 U.S.C. § 3500 (1994), Petitioner Coneo–Guerrero thus concludes that

---

**6.** The risk of excluding unlawfully seized evidence at trial deters police misconduct; habeas review of cases involving alleged Fourth Amendment violations would have no additional deterrent effect.

he deserves an evidentiary hearing on the potential due process violation.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant, Brady, was found guilty of first-degree murder after the prosecution suppressed evidence that another person had confessed to the killing. *Id.* at 84, 83 S.Ct. 1194. The Supreme Court found that the government's suppression of this confession violated Brady's due process rights. *Id.* at 86, 83 S.Ct. 1194. The Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194.

■ *Brady* does not apply to the instant case. Petitioner Coneo–Guerrero has not identified any evidence favorable to him that was suppressed by the government. Since Petitioner Coneo–Guerrero's arrest and the seizure of the vessel on the high seas were not unlawful, evidence that these events took place on international waters would not have exculpated him. Therefore, we dismiss Petitioner Coneo–Guerrero's *Brady* claim.

The Jencks Act provides that statements of government witnesses are to be provided to a criminal defendant after the witness has testified on direct examination.[7]

Since Petitioner Coneo–Guerrero has not identified any government witness whose statements were not provided to him, we also dismiss his Jencks Act claim.

### 5. *Ineffective Assistance of Counsel*

Finally, Petitioner Coneo–Guerrero argues that he is entitled to habeas relief because he received ineffective assistance of counsel at trial.

■ In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court provided the applicable bipartite standard of review for ineffective assistance of counsel claims. The Court stated that:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690, 104 S.Ct. 2052. The Supreme Court also required that the petitioner show that his counsel's acts or omissions prejudiced him. *See id.* at 692, 104 S.Ct. 2052. Generally, a petitioner's burden is a heavy one, as "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable profession-

---

7. The Jencks Act reads:
 (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
 (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defen-

dant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
18 U.S.C. § 3500.

al assistance.' " *Smullen v. United States,* 94 F.3d 20, 23 (1st Cir.1996) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

 The same attorney, Miguel Calderón, represented Petitioner Coneo–Guerrero and his three co-defendants at trial, and Petitioner Coneo–Guerrero argues that this joint representation by counsel created an impermissible conflict of interest. Petitioner Coneo–Guerrero claims that he was coerced by his co-defendant Domínguez, the ship's captain, into retaining Calderón as his attorney. Petitioner Coneo–Guerrero submits that he could not ask the court for a separate attorney because he feared for his own life, as well as for the safety of his family members in Colombia. Petitioner Coneo–Guerrero claims that he knew Domínguez had high-level contacts in Colombia and could easily order the murder of Petitioner Coneo–Guerrero or his family.

Petitioners had the benefit of three *Foster* hearings held pursuant to Federal Rule of Criminal Procedure 44(c) to determine whether Calderón's representation of the four co-defendants created a conflict of interest.[8] On July 6, 1995, the magistrate judge held a *Foster* hearing in which he thoroughly explained to Petitioners the potential disadvantages of retaining joint counsel. The magistrate advised Petitioners that their interests might be better served by retaining separate counsel if one of the Petitioners was less culpable than the others. The magistrate informed Petitioners that the joint representation by Calderón might hinder independent plea negotiations with the prosecution. The magistrate advised Petitioners that joint representation by Calderón would affect their ability to testify at trial, if their testimony would inculpate their co-defendants. All three Petitioners, along with co-defendant Domínguez, agreed to be represented by the same lawyer.

On August 22, 1995, this court held a second *Foster* hearing to ensure that Petitioners understood their right to a separate attorney if they desired one. We informed Petitioners that joint representation by Calderón would affect their trial in numerous ways. Calderón might be prevented from pursuing independent plea negotiations with the government on behalf of one defendant but not the others. Calderón would not be able to carry out an independent investigation surrounding the facts of the case to advance each Petitioner's particular situation. The attorney-client privilege might prevent Calderón from communicating information gathered from one defendant to his co-defendants. The joint representation might affect their ability to waive a trial by jury. Calderón's representation of all four co-defendants would impact his use of peremptory challenges when selecting a jury. Calderón's joint representation might prevent him from challenging the admission of evidence that would be favorable to one defendant and prejudicial to the other defendants. The multiple representation arrangement might prevent Calderón from introducing evidence exculpatory of one defendant and

---

**8.** The rule provides:

Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

FED R. CRIM. P. 44(c).

inculpatory of another defendant. Joint representation might inhibit Calderón's ability to fully cross-examine the government's witnesses. And the multiple representation would prohibit Calderón from arguing the relative culpability of one co-defendant compared with the others at sentencing.

Petitioners expressed that they understood all these consequences of the joint representation. This court strongly recommended that Petitioners obtain separate counsel. We informed Petitioners that since Calderón was being paid by a third party, it was possible that Calderón might retain loyalties to the third party who was paying him instead of to Petitioners. Petitioners affirmed, under oath, that they all wished to be represented by Calderón.

On February 8, 1997, we held a third hearing to address a motion submitted by Petitioner Arango–Herrera after the trial, claiming that Calderón's performance was compromised by an alleged conflict of interest. We determined that none of the Petitioners had complained about Calderón's representation at any point during the trial. Petitioner Arango–Herrera confirmed that all the Petitioners had been pleased with Calderón's performance up until the moment the jury returned a guilty verdict. At the hearing, Calderón presented a sworn statement, signed by Petitioners and co-defendant Domínguez, stating the following: "we declare that no pressure, intimidation, either physical or psychological, has been made upon us to sign this document, prepared at the MDC Guaynabo on July 15th, 1995. And that we wish that Attorney Miguel Calderón continue to represent us in the process … filed against us." *See Transcript of Hearing at Docket Document No. 97, United States v. Arango–Herrera* (D.P.R.1995) (No. 95–218).

This court has independently reviewed the transcripts of all three *Foster* hearings, as well as the transcripts of the jury trial. We are convinced that Petitioners voluntarily and knowingly waived their right to separate representation by counsel, after having been fully informed by this court on more than one occasion of the potential ramifications of the multiple representation.

In its opinion affirming our April 11, 1996 judgments, the First Circuit dealt with the issue of joint representation at length and reached the same determination that Petitioners had voluntarily and knowingly waived their right to separate counsel. *See Coneo–Guerrero*, 148 F.3d 44. The First Circuit concluded that "the problem with Calderon's representation appears not to have been disloyalty, but rather his lack of success and his cost." *Id.* at 49. We concur with the First Circuit's assessment. "When a defendant knowingly selects a course of action, fully cognizant of its perils, he cannot later repudiate it simply because his case curdles." *United States v. Saccoccia*, 58 F.3d 754, 772 (1st Cir.1995). We resoundingly reject Petitioner Coneo–Guerrero's argument that the joint representation of Petitioners by Calderón infringed upon his Sixth Amendment rights.

In addition to his claim that Calderón's performance was deficient due to the joint representation, Petitioner Coneo–Guerrero maintains that the following acts or omissions also constituted ineffective assistance of counsel: (1) Calderón allegedly did not challenge this court's jurisdiction; (2) Calderón allegedly did not move to suppress evidence purportedly obtained in violation of the Fourth Amendment because Petitioners were arrested in international waters; (3) Calderón purportedly never met with Petitioner Coneo–Guerrero alone; and (4) Calderón allegedly did not explain

to Petitioner Coneo–Guerrero his rights and the minimum and maximum sentences to which he was subject if he was found guilty at trial.

██ Calderón's alleged failure to challenge this court's jurisdiction and his alleged failure to object to the admission of evidence were reasonable decisions, given that the jurisdiction of this court was beyond peradventure and no Fourth Amendment violation had occurred for the reason stated by Petitioner Coneo–Guerrero. We find that these alleged omissions do not constitute ineffective assistance of counsel.

With regard to Petitioner Coneo–Guerrero's claim that Calderón never met with him alone, the record shows that Calderón interviewed each defendant separately. *Transcript of Foster Hearing at Docket Document No. 88, United States v. Domínguez–Moreno* (D.P.R.1995) (No. 95–218). Thus, we dismiss Petitioner Coneo–Guerrero's contention in this regard.

Petitioner Coneo–Guerrero claims that Calderón did not properly explain the petitioner's rights and the risks of trial to him. Petitioner Coneo–Guerrero maintains that Calderón informed Petitioners before the trial that they had already won, because of some undisclosed "twine or thread analysis" that had been conducted. Petitioner Coneo–Guerrero claims that Calderón informed Petitioners that he had purchased airline tickets for them to be flown home to Colombia. Petitioner Coneo–Guerrero avers that he never wanted to go to trial and would have accepted a plea agreement if Calderón had properly advised him.

██ A mere allegation by a habeas petitioner that his attorney wrongly advised him to go to trial does not warrant an evidentiary hearing. *United States v. Rodriguez Rodriguez*, 929 F.2d 747, 753 (1st Cir.1991). Moreover, the record shows that Calderón actually encouraged Petitioners to accept a plea bargain, but to no avail. *See Transcript of Hearing at Docket Document No. 97, United States v. Arango–Herrera* (D.P.R.1995) (No. 95–218). We reject Petitioner Coneo–Guerrero's contention that Calderón failed to advise him on the risks of going to trial, in violation of the Sixth Amendment.

We dismiss Petitioner Coneo–Guerrero's motion for habeas relief.

## B. *Petitioner Arango–Herrera*

### 1. *Relation Back*

██ Petitioner Arango–Herrera filed his section 2255 petition on April 26, 2000. In this original motion, Petitioner Arango–Herrera claimed the following grounds for relief: (1) ineffective assistance of counsel; and (2) denial of his right to counsel. On June 3, 2000, Petitioner Arango–Herrera submitted an "Appendix to Defendant's § 2255 Motion," in which he alleged additional constitutional violations.

In order for us to entertain Petitioner Arango–Herrera's section 2255 claims, the arguments must have been timely asserted or they must relate back to timely filed claims. We first assess whether the statute of limitations governing habeas petitions prevents us from considering the merits of Petitioner Arango–Herrera's claims.

The Antiterrorism and Effective Death Penalty Act provides, in pertinent part: "[a] 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from ... the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255 (1994 & Supp. I.2000). Petitioners' convictions became final when the Supreme Court denied certiorari on April 26, 1999. *See Rogers v. United States*, 180 F.3d 349, 352 (1st Cir. 1999). Petitioner Arango–Herrera's June 3, 2000 appendix was filed after the limita-

tions period for filing a section 2255 petition had expired on April 27, 2000, one year after Petitioners' convictions became final.

 A habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242 (1994 & Supp. I.2000). If a habeas petitioner attempts to amend a petition after the statute of limitations has expired, the amendment relates back to the original pleading if the requirements of Rule 15(c) of the Federal Rules of Civil Procedure are met. *See United States v. Thomas,* 221 F.3d 430, 436 (3d Cir.2000); *United States v. Pittman,* 209 F.3d 314, 317 (4th Cir.2000); *United States v. Craycraft,* 167 F.3d 451, 457 (8th Cir. 1999). Rule 15(c) provides: "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P. 15(c)(2).

Thus, "[t]he fact that amended claims arise from the same trial and sentencing proceeding as the original motion does not mean that the amended claims relate back for purposes of Rule 15(c)." *Pittman,* 209 F.3d at 318. An amendment to a habeas petition may relate back to the date of the original petition only if "the proposed amendment does not seek to add a new claim or to insert a new theory into the case." *Thomas,* 221 F.3d at 431. Since Petitioner Arango–Herrera seeks to add new, unrelated theories to his original habeas petition, his new claims do not relate back to the date of his original section 2255 petition and are therefore time-barred.

In the June 3, 2000 appendix, Petitioner Arango–Herrera alleged the following additional grounds for habeas relief: (1) this court lacked subject matter jurisdiction over the underlying offenses; (2) Petitioner Arango–Herrera was actually innocent; (3) all of the evidence obtained during the arrest of Petitioners should have been suppressed because their Fourth Amendment rights were violated; and (4) Petitioner did not knowingly and voluntarily waive his Fifth Amendment rights. Petitioner Arango–Herrera's original section 2255 petition only presented ineffective assistance of counsel claims. We find that Petitioner Arango–Herrera's new claims with regard to subject matter jurisdiction, actual innocence, and alleged Fourth and Fifth Amendment violations do not relate to the same transaction or occurrence as his original ineffective assistance of counsel claims. Consequently, we do not consider these new arguments.

### 2. *Ineffective Assistance of Counsel*

Petitioner Arango–Herrera claims that his trial counsel, Miguel Calderón, rendered unconstitutionally defective representation. First, Petitioner Arango–Herrera alleges that Calderón failed to give him an objective assessment that a guilty plea might be desirable. Calderón purportedly did not advise Petitioner Arango–Herrera of the minimum and maximum sentences to which he was subject. Calderón also allegedly did not inform Petitioner Arango–Herrera that he could receive a reduction in his sentence if he pled guilty or if he could demonstrate a lesser role in the crimes. Second, Petitioner Arango–Herrera avers that Calderón rejected two plea bargains offered by the government without giving Petitioner an opportunity to consider them. Consequently, Petitioner Arango–Herrera claims that "[s]ubjecting [him] to trial was the equivalent of sending the Japanese pilots on kamikaze missions in World War II," because the prosecution

had collected overwhelming evidence against him.

Last, Petitioner Arango–Herrera asserts that Calderón did not arrange for independent scientific testing of the evidence to determine whether the cocaine traces in the burlap sacks recovered from the ship matched the cocaine found floating in the ocean at Cayo Cabuzazos.

 We find Petitioner Arango–Herrera's assertions to be meritless. First, the record contradicts Petitioner Arango–Herrera's claim that Calderón failed to advise him to plead guilty. At the February 8, 1997 hearing, Calderón informed this court that he had sought a plea bargain and had strongly advised Petitioners to accept a deal with the government. Calderón stated:

Up until the time of trial I almost begged these people to take the plea agreement just before entering for trial. I discussed every inch, piece of evidence that was presented. This gentleman [Petitioner Arango–Herrera] is not telling the truth. I have tried out-go out [sic] of my way for them to accept a plea agreement, because I even gave them a percentage of convictions in this court and a percentage of convictions in this kind of case.

Transcript of Hearing at Docket Document No. 97, United States v. Arango–Herrera (D.P.R.1995) (No. 95–218). Since Calderón is an officer of the court and a member of this district's bar in good standing, we credit his assertions.

Similarly, we discredit Petitioner Arango–Herrera's allegations with regard to the plea offers. Petitioner Arango–Herrera's affidavit, which is attached to his habeas petition, contains the following statements:

[O]n or about September 15, 1995, Mr. Calderón told us that the Government had presented a plea bargain to him, that if we pled guilty we would receive only 37 months imprisonment. Mr. Calderón told us that he had rejected that plea bargain because it also included a proviso that the captain, Mr. Dominguez, would have to serve more time than us, the three other defendants ....
On the morning of the trial, on December 11, 1995, just prior to the start of the court proceedings, we were sitting at the defense table in the courtroom with Mr. Calderón, when an assistant to the Prosecutor, a lady came over to out [sic] table and began to talking [sic] to Mr. Calderón. She was speaking in Spanish, and we all listened to the conversation. She told Mr. Calderón that the Government was prepared to accept a sentence of seven (7) years from each of us in return for a guilty plea. Mr. Calderón, without ever asking me or any of us, told her that he was not going to accept that plea bargain.

We find that Petitioner Arango–Herrera's allegations about purported plea offers summarily rejected by Calderón do not warrant further investigation. As previously stated, Calderón made considerable efforts to secure a plea bargain for Petitioners' benefit, yet Petitioners insisted on going to trial. See Transcript of Hearing at Docket Document No. 97, United States vs. Arango–Herrera (D.P.R.1995) (No. 95–218). Petitioner Arango–Herrera has not presented convincing evidence in the record to buttress his claim that Calderón rejected plea offers out-of-hand without consulting with Petitioners. We decline to credit the allegations in Petitioner Arango–Herrera's affidavit.

 Finally, with regard to Calderón's alleged failure to arrange for independent scientific testing on the burlap sacks, we find that the attorney made a reasonable, strategic decision against pur-

suing this line of investigation, given that law enforcement agents had observed Petitioners dumping cocaine-filled bundles overboard into U .S. territorial waters. Counsel's decision to pursue one strategy instead of another does not render Calderón's assistance unconstitutionally deficient. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

### 3. *Denial of Right to Counsel*

 Petitioner Arango–Herrera submits that he was constitutionally entitled to independent legal representation at the *Foster* hearings held pursuant to Federal Rule of Criminal Procedure 44(c).

 Generally, a criminal defendant is not entitled to representation by counsel at all stages of the judicial proceedings. 2 LAFAVE ET AL., *supra,* § 7.3(a). Rule 44(c) itself does not expressly require that a defendant be represented by an uninterested attorney during a *Foster* hearing. *See* FED. R. CRIM. P. 44(c). Moreover, the Advisory Committee for the Federal Rules notes that "Rule 44(c) does not specify what particular measures must be taken [with regard to appointment of counsel]. It is appropriate to leave this within the court's discretion, for the measures which will best protect each defendant's right to counsel may well vary from case to case." FED. R. CRIM. P. 44(c) advisory committee's note. Additionally, Petitioner Arango–Herrera has not cited, and we have not found, any case law supporting the proposition that a defendant is entitled to representation by an independent attorney during a *Foster* hearing. Consequently, we reject Petitioner Arango–Herrera's argument that he was denied his right to counsel at the Rule 44(c) hearings.

We dismiss Petitioner Arango–Herrera's petition for section 2255 relief.

### C. *Petitioner Villa–Contreras*

Petitioner Villa–Contreras seeks habeas relief based on the following grounds: (1) lack of jurisdiction; (2) ineffective assistance of counsel; and (3) improper jury instructions.

### 1. *Jurisdiction*

Petitioner Villa–Contreras challenges the jurisdiction of this court at trial because law enforcement agents arrested Petitioners and seized their vessel in international waters. As explained *supra* at (III)(A)(1), this court properly exercised jurisdiction over Petitioners' offenses.

### 2. *Ineffective Assistance of Counsel*

Petitioner Villa–Contreras submits that his constitutional right to effective assistance of counsel was violated in two respects: (1) Calderón had a conflict of interest with Petitioner Villa–Contreras; and (2) Calderón did not argue that this court lacked jurisdiction over Petitioners' crimes.

Petitioner Villa–Contreras argues that his Sixth Amendment rights were violated because Calderón had a strong conflict of interest with him. Petitioner Villa–Contreras claims that he was coerced by his co-defendant, Domínguez, to accept Calderón's representation. Petitioner Villa–Contreras further maintains that Domínguez threatened to kill him and to order the killing of his family in Colombia if Petitioner Villa–Contreras did not follow Domínguez' orders. As a result, Petitioner Villa–Contreras complains that the

three *Foster* hearings conducted by this court failed to properly ascertain whether Petitioners knowingly, voluntarily, and intelligently waived their right to separate counsel. We dismiss Petitioner Villa–Contreras' claim that the multiple representation violated his Sixth Amendment rights, *see supra* at (III)(A)(5).

Petitioner Villa–Contreras contends that Calderón was incompetent because he failed to challenge the court's lack of jurisdiction over his crimes. We find no error for the aforementioned reasons, *see supra* at (III)(A)(5).

### 3. *Jury Instructions*

Petitioner Villa–Contreras submits that this court failed to properly instruct the jury on the definitions of "importation" and "customs waters." Petitioner Villa–Contreras argues that since this court erred in its jury instructions, his Fifth and Sixth Amendment rights were violated.

 Issues decided on direct appeal generally cannot be relitigated in a section 2255 motion. *United States v. Michaud,* 901 F.2d 5, 6 (1st Cir.1990) (per curiam); *Tracey v. United States,* 739 F.2d 679, 682 (1st Cir.1984). The issue may be reconsidered only if there has been an intervening change in the law. *Davis v. United States,* 417 U.S. 333, 342, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974).

The First Circuit considered and disposed of this issue, finding that although we did not explain that the territory of the United States extended only twelve miles from the shores of Puerto Rico, the jury was adequately informed about the bound-ary between international waters and customs waters by the testimony of a U.S. Customs inspector. *Coneo–Guerrero,* 148 F.3d at 50. Since this issue was decided on appeal and there has not been an intervening change in the law, we do not consider the matter on habeas review.

### IV.

### *Conclusion*

In accordance with the foregoing, we summarily **DISMISS** Petitioners' motions for habeas relief. *Rule 4, Rules Governing Section 2255 Proceedings in the United States District Courts.*[9]

**IT IS SO ORDERED.**

---

**9.** The rule provides, in relevant part:

The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.
*Rule 4, Rules Governing Section 2255 Proceedings in the United States District Courts.*